IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| THE INCLUSIVE COMMUNITIES PROJECT, INC. | § § § | |
| Plaintiff, | § § | |
| VS. | § | NO. 3-07-CV-0945-O |
| U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT | § § § § | |
| Defendant. | § § | |

**FINDINGS AND RECOMMENDATION OF THE**
**UNITED STATES MAGISTRATE JUDGE**

Defendant U.S. Department of Housing and Urban Development ("HUD") has filed a motion to dismiss this action for injunctive relief brought under the Administrative Procedures Act ("APA"), 5 U.S.C. § 701, *et seq.* For the reasons stated herein, the motion should be granted in part and denied in part.

I.

Plaintiff The Inclusive Communities Project, Inc. ("ICP") is a non-profit organization that provides assistance to minority families participating in the Housing Choice Voucher Program under Section 8 of the United States Housing Act of 1937 ("NHA"), as amended, 42 U.S.C. § 1437, *et seq.* (*See* Plf. Compl. at 1, ¶ 2 & 9, ¶ 32). The mission of the organization is to "break down barriers to the creation of racially and economically inclusive communities." (*Id.* at 1, ¶ 2). To further this goal, plaintiff provides mobility and financial assistance to low-income African-American families who want to obtain rental housing in predominantly Caucasian areas in and around Dallas. (*Id.* at 9-10, ¶ 33). The mobility assistance includes negotiating with landlords to obtain Section 8 housing

in eligible areas at affordable rents. (*Id.*). The financial assistance provided by plaintiff to its clients includes the payment of application fees, security deposits, and utility deposits. (*Id.*).

Under the Section 8 voucher program, HUD contracts with local public housing agencies and private landlords to pay the difference between a fair market rent for the area and the amount paid by the low-income tenant.[1] *See generally*, 42 U.S.C. § 1437f(o). HUD is responsible for establishing fair market rents, or FMRs, for the rental housing market area. *See id.* § 1437f(c)(1). The HUD regulations explain how these FMRs are calculated:

> Fair Market Rents (FMRs) are estimates of rent plus the cost of utilities, except telephone. FMRs are housing market-wide estimates of rents that provide opportunities to rent standard quality housing throughout the geographic area in which rental housing units are in competition. The level at which FMRs are set is expressed as a percentile point within the rent distribution of standard quality rental housing units in the FMR area. FMRs are set at the 40th or 50th percentile rent--the dollar amount below which the rent for 40 or 50 percent of standard quality rental housing units falls. The 40th or 50th percentile rent is drawn from the distribution of rents of all units that are occupied by recent movers. Adjustments are made to exclude public housing units, newly built units and substandard units.

24 C.F.R. § 888.113(a). The regulations emphasize that HUD "uses the most accurate and current data available to develop the FMR estimates," including census data and random digit dialing telephone surveys. *See id.* § 888.113(e)(1). Using this method, HUD annually estimates FMRs for approximately 350 metropolitan areas and 2,300 non-metropolitan counties throughout the United States. *See generally*, *Franconia Assoc. v. United States*, 61 Fed. Cl. 718, 760 (2004). The issue in this case involves the geographic area used by HUD to determine FMRs in the Dallas rental housing market.

---

[1] A tenant family may be required to pay up to 40% of its monthly adjusted income for rent. *See* 42 U.S.C. § 1437f(o)(2)(A)(i) & (o)(3).

The Dallas, TX HUD Metro FMR area is comprised of eight counties, which are carved out of a larger Dallas-Fort Worth-Arlington metropolitan statistical area defined by the Office of Management and Budget ("OMB"). (*See* Plf. Compl. at 3-4, ¶¶ 9 & 13). According to plaintiff, this practice of using a large multi-county region as the starting point for determining FMR violates both the NHA, which requires HUD to base FMRs on "market area," and the Fair Housing Act of 1968 ("FHA"), 42 U.S.C. § 3601, *et seq.*, which imposes an affirmative duty on HUD to promote fair housing policies. (*See id.* at 11, ¶ 37). Succinctly stated, plaintiff contends that HUD's practice incorporates rents from predominately minority housing markets, where many of the neighborhoods are blighted and have inadequate public and private services and facilities, and results in lower FMRs for the Dallas rental housing market area, thereby precluding Section 8 program participants from obtaining rental housing in more affluent Caucasian areas. (*See id.* at 3, ¶ 10). Instead, plaintiff argues that HUD should use smaller geographic areas to determine FMRs, which would more accurately reflect the rent levels in Caucasian neighborhoods and give low-income minority families equal access to rental housing in those neighborhoods. (*See id.* at 6-7, ¶ 19). In this lawsuit, plaintiff seeks broad equitable relief, including an injunction: (1) compelling HUD to use smaller rental housing market areas, instead of large multi-county regions, as a basis for determining FMRs; (2) requiring HUD to establish separate Section 8 program rent levels for separate rental housing markets; and (3) compelling HUD to "consider and further fair housing opportunities" for minority participants in the Section 8 program when it sets rent levels. (*See id.* at 11-12, ¶ 39).

The case is before the court on defendant's motion to dismiss for lack of subject matter jurisdiction. As grounds for its motion, defendant contends that plaintiff lacks standing to bring this suit and that HUD has not waived sovereign immunity. The issues have been fully briefed by the parties and the motion is ripe for determination.

II.

The gravamen of defendant's standing argument is that the remedies sought by plaintiff will not redress its injuries and amount to nothing more than generalized grievances.[2] Because standing is a prerequisite to the exercise of federal jurisdiction, the court considers this issue first. *See Cole v. General Motors Corp.*, 484 F.3d 717, 721 (5th Cir. 2007).

A.

"The doctrine of standing addresses the question of who may properly bring suit in federal court." *The Inclusive Communities Project, Inc. v. Texas Dept. of Housing & Comm. Affairs*, No. 3-08-CV-0549-D, 2008 WL 5191935 at *2 (N.D. Tex. Dec. 11, 2008). To satisfy the case-or-controversy requirement of Article III of the Constitution, the plaintiff must establish that it has "suffered 'injury in fact,' that the injury is 'fairly traceable' to the actions of the defendant, and that the injury will likely be redressed by a favorable decision." *Id.*, 2008 WL 5191935 at *2, *quoting Bennett v. Spear*, 520 U.S. 154, 162, 117 S.Ct. 1154, 1161, 137 L.Ed.2d 281 (1997). An injury in fact must be "concrete and . . . actual or imminent, not conjectural or hypothetical." *Id.*, *quoting Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992). Moreover, "the injury must affect the plaintiff in a personal and individual way." *Id.*, *quoting Lujan*, 112 S.Ct. at 2136 n.1. Stated differently, a party must assert its own legal rights and interests, and cannot rest its claim to relief on the legal rights or interests of third parties. *See Warth v. Seldin*, 422 U.S. 490, 500, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975). For injunctions, the plaintiff must also show that it is likely to suffer future injury as a result of the challenged conduct,

---

[2] Defendant also argues that plaintiff lacks standing to sue on behalf of its clients, that plaintiff cannot obtain injunctive relief for past injuries, and that any claims based on FMRs, other than the FMRs currently in effect, are moot. (*See* Def. Mot. Br. at 10-12, 15). In its response, plaintiff makes clear that it seeks relief only for its own injuries and only with respect to HUD's current practice of determining FMRs. (*See* Plf. Resp. Br. at 20-21). The court therefore declines to address these other grounds for dismissal. However, in order to clarify its claims and the nature of relief sought, plaintiff should amend its complaint before this case proceeds further.

and that the relief requested will prevent that future injury. *See James v. City of Dallas*, 254 F.3d 551, 563 (5th Cir. 2001), *cert. denied*, 122 S.Ct. 919 (2002), *citing City of Los Angeles v. Lyons*, 461 U.S. 95, 102, 103 S.Ct. 1660, 1665, 75 L.Ed.2d 675 (1983). However, "if the injury is accompanied by any continuing, present adverse effects, standing for injunctive relief can be found." *Id.*, *quoting Lyons*, 103 S.Ct. at 1665 (internal quotations omitted).

As the party seeking to invoke federal jurisdiction, plaintiff bears the burden of proving its standing. *See Inclusive Communities Project*, 2008 WL 5191935 at *2, *citing Lujan*, 112 S.Ct. at 2136. A defendant may challenge standing by filing a Rule 12(b)(1) motion to dismiss. If the defendant merely brings a Rule 12(b)(1) motion, it is considered a facial attack, and the court looks only to the sufficiency of the allegations in the pleading, assuming them to be true. *See Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. 1981). The court must deny the motion if the allegations are sufficient to allege jurisdiction. *See Inclusive Communities Project*, 2008 WL 5191935 at *3. A defendant may also make a factual attack on subject matter jurisdiction by submitting evidence, such as affidavits and testimony. *See Middle South Energy, Inc. v. City of New Orleans*, 800 F.2d 488, 490 (5th Cir. 1986). When a defendant provides evidence factually attacking subject matter jurisdiction, the plaintiff must submit evidence and prove by a preponderance of the evidence that the court has jurisdiction. *Id.* In the instant case, HUD has submitted an affidavit in support of its Rule 12(b)(1) motion. However, nothing in the affidavit challenges any factual matters necessary to the determination of standing. The court therefore treats the motion as a facial attack, rather than a factual attack, on jurisdiction. *See Estate of Merkel v. United States*, No. 3-06-CV-1891-D, 2008 WL 5378183 at *2 n.2 (N.D. Tex. Dec. 23, 2008) (treating Rule 12(b)(1) motion as facial attack where affidavits submitted by defendant did not challenge any factual matter bearing on jurisdiction);

*IBEW-NECA Southwestern Health & Benefit Fund v. Winstel*, No. 3-06-CV-0038-D, 2006 WL 954010 at *1 (N.D. Tex. Apr. 12, 2006) (same).

B.

Defendant contends that plaintiff lacks standing to challenge HUD's practice of determining FMRs for the Dallas rental housing market because the injunctive relief it seeks will not redress its injuries. Under the third requirement of Article III standing, plaintiff must show that it is "'likely,' as opposed to merely 'speculative,' that the injury will be redressed by a favorable decision." *Lujan*, 112 S.Ct. at 2136. Although defendant does not directly challenge plaintiff's alleged injuries at the pleading stage, (*see* Def. Reply at 2), it is necessary to briefly discuss the nature of those injuries before examining redressability.

1.

A non-profit fair housing organization, such as plaintiff, can establish injury by showing that the challenged unlawful conduct frustrates its mission and requires it to devote significant resources to counteracting the discriminatory effects of that conduct. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379, 102 S.Ct. 1114, 1124-25, 71 L.Ed.2d 214 (1989). Here, plaintiff alleges that HUD's practice of using a large multi-county region as the starting point for determining FMRs results in racial segregation in the Dallas rental housing market, thereby frustrating plaintiff's mission of promoting equal housing opportunities and requiring the expenditure of more time and more money to achieve its goals. (*See* Plf. Compl. at 7, ¶ 26 & 10, ¶ 35). In particular, plaintiff alleges that HUD's rent setting policy directly and adversely affects its interests by:

- reducing the number of units that plaintiff can use to help its clients find housing in non-minority concentrated market areas;

- increasing the amount of time per client that plaintiff must spend in order to help its clients find housing in non-minority concentrated market areas;

- increasing the amount of financial assistance that plaintiff must spend in order to help its clients find housing in non-minority concentrated market areas; and

- discouraging families who work with plaintiff from choosing dwelling units in market areas that offer racially integrated housing because of the cost factors involved in such a choice.

(*See* Plf. Compl. at 10, ¶ 35). Similar allegations of harm suffered by non-profit housing organizations have been held sufficient to establish injury for standing purposes. *See, e.g. Havens Realty*, 102 S.Ct. at 1123-25; *Inclusive Communities Project*, 2008 WL 5191935 at *4.

2.

The issue raised by defendant is whether the remedy requested by plaintiff is likely to redress its injuries. The court has little difficulty concluding that an injunction requiring HUD to use smaller rental housing market areas, instead of a large multi-county region, as a basis for determining FMRs would result in higher rental rates in predominantly Caucasian areas of Dallas, thereby expanding opportunities for low-income African American families to obtain Section 8 housing in those areas. With more rental housing opportunities available in non-minority areas, plaintiff likely will have to spend less time and less money helping clients secure housing in desegregated neighborhoods. At least at the pleading stage, plaintiff has sufficiently demonstrated that it is likely, as opposed to merely speculative, that its injuries will be redressed by a favorable decision in this case. *See Inclusive Communities Project*, 2008 WL 5191935 at *6.[3]

---

[3] This conclusion is bolstered if the court treats defendant's Rule 12(b)(1) motion as a factual attack, rather than a facial attack, on jurisdiction. In an attempt to counter defendant's argument that the relief requested in this lawsuit would not necessarily expand housing opportunities in predominantly Caucasian areas, plaintiff relies on the affidavit of its Mobility Assistance Director, Stephanie McGee, who states:

C.

Defendant further contends that plaintiff's request for a broad injunction eliminating racial disparities in the Dallas rental housing market area is nothing more than a "generalized grievance." At issue is plaintiff's request for:

> an injunction compelling HUD to set separate Section 8 program rent levels for the separate rental housing markets at dollar amounts that provide DHA's Black Section 8 voucher program participants equal access to rental housing in the White rental housing markets. Equal access is achieved by setting rent levels using the 50th percentile basis for each of the rental housing markets and eliminating the disparities between the number and percent of dwelling units made available in predominately White rental housing markets and the number and percent of dwelling units made available in predominantly minority rental housing markets.

(*See* Def. Mot. Br. at 10 & Def. Reply at 2, *citing* Plf. Compl. at 12, ¶ 39D). Relying on the Fifth Circuit's decision in *James v. City of Dallas*, 254 F.3d 551 (5th Cir. 2001), defendant argues that the injunction sought by plaintiff is too general to support Article III standing.

---

> During the period from May 2007 through September 2007 ICP negotiated with 44 landlords in predominantly white areas on behalf of African American Section 8 voucher participants concerning the issues raised by the rent being higher than the Section 8 rent as set by HUD Fair Market Rent level. In 20 instances, the landlord refused to lower the rent even though the tenant was eligible to rent the unit. In these cases, but for the fact that rents set by the HUD Fair Market Rent levels were lower than the rent charged by the landlord, the Section 8 participant would have rented that specific unit in a predominately white area.
>
> During that same period ICP was able to negotiate with 24 landlords who agreed to lower the contract rent for the dwelling unit in order for an African American Section 8 participant to rent the unit. In these cases, ICP was only able to obtain the rent reduction by paying the landlord a bonus. The bonus was high enough in these instances for the landlord to forego its usual rent and lower the rent charged to the Section 8 participant. ICP has spent $23,686.50 for these bonus payments during this period.

(*See* Plf. Resp. App. at 3). This evidence, if considered by the court, supports the conclusion that the injury alleged by plaintiff--the increased time and costs associated with helping minority families obtain rental housing in non-minority areas--likely would be redressed by an injunction requiring HUD to use smaller rental housing market areas as the basis for determining FMRs.

*James* was a class action brought by two African-American homeowners against the City of Dallas and HUD challenging the demolition of repairable single-family homes in predominately minority neighborhoods without proper notice or a warrant, and charging that the "no-notice" demolition program was the result of intentional race discrimination. *James*, 254 F.3d at 558. In their complaint, the plaintiffs sought, *inter alia*, "a permanent injunction requiring HUD to administer all of its housing programs in a manner that will eradicate the effects of HUD's discriminatory demolition practices[.]" *Id.* at 561. The Fifth Circuit held that this broad request for injunctive relief was not sufficiently targeted to remedy plaintiffs' specific injuries. *Id.* at 568. Therefore, the plaintiffs lacked standing to seek such relief. *Id.*, citing *Warth*, 95 S.Ct. at 2205 (recognizing that a "generalized grievance" shared in substantially equal measure by all or most citizens cannot provide standing to request injunctive relief).

Unlike the injunction requested in *James*, the relief sought by plaintiff in the instant case is not a "sweeping request to generally eradicate the effects of discrimination." *Cf. id.* Instead, plaintiff asks the court to require HUD to "set separate Section 8 program rent levels for the separate rental housing markets at dollar amounts that provide DHA's Black Section 8 voucher program participants equal access to rental housing in the White rental housing markets." (*See* Plf. Compl. at 12, ¶ 39D). Plaintiff goes on to suggest that "[e]qual access is achieved by setting rent levels using the 50th percentile basis for each of the rental housing markets and eliminating the disparities between the number and percent of dwelling units made available in predominately White rental housing markets and the number and percent of dwelling units made available in predominantly minority rental housing markets." (*Id.*). Read in its entirety, it is clear that plaintiff does not seek a broad injunction to "eliminat[e] racial disparities in housing opportunities," as defendant argues in its motion. (*See* Def. Mot. Br. at 10). By enjoining HUD from using a large multi-county region as a basis for

determining FMRs and requiring the agency to set separate rent levels for separate rental housing markets defined by smaller geographic areas, plaintiff is attempting to further its mission of helping low-income minority families gain access to the rental housing market in predominantly Caucasian areas of Dallas. Such relief is targeted to remedy plaintiff's specific injury of having to spend more time and more money to accomplish its goals, and does not seek to redress a "generalized grievance." Thus, plaintiff has demonstrated Article III standing to prosecute this claim for injunctive relief.

III.

The court next considers whether plaintiff's claims under the APA, through which it seeks redress for alleged violations of the NHA and the FHA, are barred by the doctrine of sovereign immunity. While recognizing that the APA allows a person to seek judicial review for an alleged legal wrong committed by a federal agency, *see* 5 U.S.C. § 702, defendant argues that this statutory waiver of sovereign immunity does not apply to plaintiff's claims because: (1) HUD's rent-setting practices are committed to agency discretion by law; and (2) plaintiff has other adequate remedies.

A.

"The basic rule of federal sovereign immunity is that the United States cannot be sued at all without the consent of Congress." *St. Tammany Parish v. Federal Emergency Management Agency*, 556 F.3d 307, 316 (5th Cir. 2009), *quoting Block v. North Dakota ex rel. Board of University & School Lands*, 461 U.S. 273, 287, 103 S.Ct. 1811, 1819, 75 L.Ed.2d 840 (1983). Section 702 of the APA authorizes suits against the United States through a limited waiver of sovereign immunity for relief other than monetary damages related to an agency's regulatory action. *Id.* at 317, *citing* 5 U.S.C. § 702. However, the waiver does not apply to agency actions that are committed to agency discretion by law. *Id.*, *citing* 5 U.S.C. § 701(a)(2). This exception to judicial review is "very narrow" and applies only "in those rare instances where 'statutes are drawn in such broad terms that

in a given case there is no law to apply.'" *Ellison v. Connor* 153 F.3d 247, 251 (5th Cir. 1998), *quoting Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410, 91 S.Ct. 814, 821, 28 L.Ed.2d 136 (1971); *see also Suntex Dairy v. Block*, 666 F.2d 158, 163 (5th Cir.), *cert. denied*, 103 S.Ct. 59 (1982). Stated differently, judicial review is unavailable only "if the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Heckler v. Chaney*, 470 U.S. 821, 830, 105 S.Ct. 1649, 1655, 84 L.Ed.2d 714 (1985).

1.

Defendant contends that its rent-setting practices are committed to agency discretion and, therefore not subject to judicial review, because the NHA does not provide meaningful standards against which the court can review HUD's determination of what constitutes a "market area." (*See* Def. Br. at 19). Plaintiff counters that the "law to apply" can be found in the text of the statute itself, HUD's own regulations, the legislative history, and other agency materials. (*See* Plf. Resp. Br. at 13-15).

Initially, the court observes that the NHA does not define the term "market area." Section 1437f(o)(1)(B), which establishes a payment standard for the tenant-based housing choice voucher program, merely provides:

> [T]he payment standard for each size of dwelling unit in *a market area* shall not exceed 110 percent of the fair market rental established under subsection (c) of this section for the same size of dwelling unit *in the same market area* and shall be not less than 90 percent of that fair market rental.

42 U.S.C. § 1437f(o)(1)(B) (emphasis added). Section 1437f(c)(1), which deals generally with the amount and scope of assistance payments, provides:

> The maximum monthly rent shall not exceed by more than 10 per centum the fair market rental established by the Secretary periodically but not less than annually for existing or newly constructed rental

> dwelling units of various sizes and types *in the market area* suitable for occupancy by persons assisted under this section[.]

*Id.* § 1437f(c)(1) (emphasis added). Although these statutory provisions use the term "market area," neither sets forth any guidelines for determining how a "market area" should be established.

An agency's own regulations can also provide the requisite "law to apply." *See Ellison*, 153 F.3d at 251. The HUD regulation cited by plaintiff explains that "FMRs are housing market-wide estimates of rents that provide opportunities to rent standard quality housing throughout the *geographic area* in which rental housing units are in competition." *See* 24 C.F.R. § 888.113(a) (emphasis added). However, this regulation does not provide any guidance for determining what constitutes a "geographic area." Certainly it does not support plaintiff's argument that large multi-county regions should not be the starting point for determining FMRs. If anything, a fair reading of the entire regulation suggests just the opposite. Section 888.113(d) states:

> FMR areas are metropolitan areas and nonmetropolitan counties (nonmetropolitan parts of counties in the New England States). With several exceptions, *the most current Office of Management and Budget (OMB) metropolitan area definitions of Metropolitan Statistical Areas (MSAs) and Primary Metropolitan Statistical Areas (PMSAs) are used because of their generally close correspondence with housing market area definitions*. HUD may make exceptions to OMB definitions if the MSAs or PMSAs encompass areas that are larger than housing market areas. The counties deleted from the HUD-defined FMR areas in those cases are established as separate metropolitan county FMR areas.

*Id.* § 888.113(d) (emphasis added). Still, nothing in the HUD regulation sets forth any identifiable factors by which a court could review the agency's determination of what constitutes a specific housing market area.

Nor is any of the legislative history cited by plaintiff useful in establishing meaningful standards for judicial review of the agency's action. Senate Report No. 93-693, which anticipated

that HUD would "define the 'areas' for which fair market rents are to be determined in such a way as not to include in a single area communities which are characterized by significant differences in rentals or construction costs for comparable housing," *see* Sen. Rep. No. 93-693, 1974 U.S.C.C.A.N. 4273, 4315 (1974), is not part of the legislative history of the bill that was ultimately passed by Congress. Instead, Congress passed the House version of the bill, which required HUD "to establish fair market rentals in each housing market area for new and existing units of various sizes and types suitable for occupancy for low-income families," but did not further define "market area." *See* H. Conf. Rep. No. 93-1279, 1974 U.S.C.C.A.N. 4449, 4465 (1974). Plaintiff also relies on a report prepared for HUD by an outside consulting firm, which recognizes that:

> An important issue [in determining the demand and supply of affordable rental housing] is what constitutes a rental housing market, that is, within what group of properties are price adjustments made. Clearly, there is no single national rental housing market. *Entire metropolitan areas (particularly the larger ones) also do not constitute single housing markets.*

(*See* Plf. Resp. App. at 26) (emphasis added). However, this report relates to the Rural Housing Service ("RHS") Section 515 program, which provides direct loans for the construction and maintenance of multi-family rental projects that serve low-income families, not the Section 8 voucher program. (*See id.* at 25).

In sum, the court concludes that there are no meaningful standards against which to review HUD's determination of what constitutes a "market area" under section 1437f of the NHA. Consequently, sovereign immunity bars any claims predicated on alleged violations of that statute.

2.

The court reaches a different conclusion with respect to alleged violations of section 3608(e)(5) of the FHA, which imposes an affirmative duty on HUD to "administer the [housing]

programs . . . in a manner affirmatively to further the policies of [the Act]." 42 U.S.C. §3608(e)(5). Numerous courts have exercised subject matter jurisdiction over claims brought against HUD under section 3608. *See, e.g. N.A.A.C.P. v. Secretary of Housing and Urban Development*, 817 F.2d 149, 160-61 (1st Cir. 1987); *Darst-Webbe Tenant Assoc. Board v. St. Louis Housing Authority*, 417 F.3d 898, 907 (8th Cir. 2005); *see also Anderson v. Jackson*, No. 06-3298, 2007 WL 458232 at *2 (E.D. La. Feb. 6, 2007) (citing cases). In its complaint, plaintiff alleges that HUD violated its duty to further the fair housing policies of the FHA by failing to consider the effects of its rent-setting practices on the racial composition of the areas affected and the integrated housing choices available to minority Section 8 participants in and around Dallas. (*See* Plf. Compl. at 11, ¶ 37). This claim is similar to other claims brought against HUD that were held to be reviewable under the APA. *See, e.g. Thompson v. U.S. Dept. of Housing and Urban Development*, 348 F.Supp.2d 398, 464 (D. Md. 2005) (suit alleging that HUD failed to fulfill its statutory duty under the FHA to consider the regional effects of its desegregation policies in regard to city's public housing); *M&T Mortgage Corp. v. White*, No. 04-CV-4775-NGGVVP, 2006 WL 47467 at *10 (E.D.N.Y. Jan. 9, 2006) (suit alleging that HUD's actions in approving mortgage insurance applications without considering the racial impact of the program violated the FHA).[4]

B.

Finally, defendant argues that plaintiff cannot seek judicial review under the APA because it has other adequate remedies at law. *See* 5 U.S.C. § 704 (authorizing judicial review of final

---

[4] The court rejects defendant's argument that the Supreme Court's decision in *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55, 124 S.Ct. 2373, 159 L.Ed.2d 137 (2004) ("*SUWA*"), precludes judicial review of plaintiff's claims for alleged violations of the FHA. In *SUWA*, the Supreme Court held that "a claim under § 706(1) [of the APA] can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take*." *SUWA*, 124 S.Ct. at 2379 (emphasis in original). However, that requirement does not apply in situations where, as here, a court is asked to review whether HUD has met its statutory duty to affirmatively further fair housing policies. *See Darst-Webbe*, 417 F.3d at 907; *Thompson v. U.S. Dept. of Housing and Urban Development*, No. MJG-95-309, 2006 WL 581260 at *4-5 (D. Md. Jan. 10, 2006).

agency actions "for which there is no other adequate remedy in a court"). The two alternative remedies suggested by defendant are: (1) a suit for money damages in the Court of Federal Claims under the Tucker Act, 28 U.S.C. § 1491(a)(1); or (2) an action against the Dallas Housing Authority ("DHA"). (*See* Def. Mot. Br. at 20-22). However, plaintiff does not seek money damages in this case. It requests only injunctive relief. Defendant wholly fails to explain how a suit for money damages would be an adequate substitute for the relief sought by plaintiff--an injunction requiring HUD to consider the effects of its rent-setting practices on the racial composition of the Dallas rental housing market and to affirmatively further fair housing opportunities for African-American Section 8 participants in the Dallas area. Nor does defendant explain how a suit against DHA would change HUD's rent-setting practices. Because no other adequate remedy is available, plaintiff may seek injunctive relief against HUD under the APA for alleged violations of the FHA.

## **RECOMMENDATION**

Defendant's motion to dismiss for lack of subject matter jurisdiction [Doc. #8] should be granted in part and denied in part. The motion should be granted on the ground of sovereign immunity with respect to plaintiff's claims for alleged violations of the NHA. In all other respects, the motion should be denied.

A copy of this report and recommendation shall be served on all parties in the manner provided by law. Any party may file written objections to the recommendation within 10 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b). The failure to file written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Services Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

Case 3:07-cv-00945-O   Document 22   Filed 07/20/09   Page 16 of 16   PageID 235

DATED: July 20, 2009.

                                   _/s/ Jeff Kaplan_  
                                   JEFF KAPLAN  
                                   UNITED STATES MAGISTRATE JUDGE